IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| FRANKLIN THOMAS CARROLL, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 4:21-cv-845-O |
| | § | |
| BOBBY LUMPKIN, Director, TDCJ-CID, | § | |
| | § | |
| Respondent. | § | |

## OPINION AND ORDER

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner Franklin Thomas Carroll ("Carroll"), a state prisoner confined in the Correctional Institutions Division of the Texas Department of Criminal Justice (TDCJ-CID), against Respondent Bobby Lumpkin, director of that division. After considering the pleadings and relief sought by Carroll, the Court concludes that the § 2254 petition must be denied.

### I. BACKGROUND

#### A. Procedural History

Carroll is in custody pursuant to a conviction out of the 415th Judicial District Court of Parker County, Texas in cause number CR16-0091, styled *The State of Texas v. Franklin Thomas Carroll*. SHR at 9–10, ECF No. 16-14.[1] Carroll was charged with and pleaded not guilty to one count of sexual assault of a child (Count I) and one count of indecency with a child by contact (Count II). *Id.* at 8, ECF No. 16-14; 3 RR 8–9, ECF No. 16-3. After the state abandoned

---

[1]"SHR" refers to the Clerk's Record of pleadings and documents filed with the court during Carroll's state habeas proceedings. *See generally, Ex parte Carroll*, No. 92,631-01 (Tex. Crim. App. 2021), ECF Nos. 16-8 through 16-14. "RR" refers to the statement of facts of the jury trial in the Reporter's Record, preceded by the volume number and followed by the page number(s). ECF Nos. 16-1

1

Count I, the jury found Carroll guilty on Count II and sentenced him to 12 years' imprisonment. 4 RR 20–21, ECF No. 16-4; 5 RR 4–5, ECF No. 16-5; 6 RR 134–35, ECF No. 16-6. The Second District Court of Appeals of Texas affirmed Carroll's conviction on February 27, 2020. *See Carroll v. State*, 02-18-00477-CR, 2020 WL 938189 (Tex. App.—Fort Worth Feb. 27, 2020, pet. ref'd); SHR at 249, ECF No. 16-14. Carroll's petition for discretionary review ("PDR") was refused by the Texas Court of Criminal Appeals ("TCCA") on July 22, 2020. *Carroll v. State*, PD-0286-20 (Tex. Crim. App. 2020).

Carroll filed an application for state writ of habeas corpus on April 9, 2021. SHR, at 13, ECF No. 16-14. The Texas Court of Criminal Appeals (CCA) denied the application without written order on June 9, 2021. *Id.* at "Action Taken" Sheet, ECF No. 16-8. Carroll timely filed the instant § 2254 petition. Pet., ECF No. 1.

### B. Factual Overview

In considering Carroll's direct appeal from his conviction, the court of appeals included a detailed summary of the facts of this case. *Carroll*, 2020 WL 938189 at *1-4. Although fairly lengthy, the Court restates this same factual summary here, with the subsections as listed in the opinion, to give broader context for review of Carroll's claims:

#### Background

> In 2015, School Resource Officer (SRO) and Springtown Police Officer Becky Lacroix was cleaning out a desk at Springtown High School when she found a sexually suggestive letter that appeared to have been written by a female student to Carroll, who had been the Springtown SRO before Lacroix. Upon further investigation, law enforcement determined that "Anna" (an alias used for the complainant) had written the letter to Carroll when she was a freshman at Springtown and that Anna alleged Carroll had touched her inappropriately while she was a freshman and he was the SRO. Carroll was eventually charged with indecency with a child by contact, and the case proceeded to trial in October

---

through 16-7.

2018.

### I.     Anna's testimony at trial

Anna, who was 19 at the time of trial, testified that she met Carroll when she got into trouble in middle school, first for an incident involving sexually explicit letters she wrote to another male student and a second time for bringing alcohol to school. Carroll, who oversaw all Springtown public schools as SRO, wrote Anna a citation for possessing alcohol as a minor, and Anna had to do community service as a result. Shortly after the alcohol incident, Anna spent time in an Arlington mental-health hospital and finished that school year at a different school. While in the mental-health hospital, Anna wrote on a worksheet that Carroll caused her "stress" and that she considered him an "external threat," but at trial she could not remember why she had written down his name. She guessed that Carroll "probably had made [her] uncomfortable" because he "seem[ed] creepy to [her]."

When Anna returned to Springtown High for her freshman year, she sought out Carroll's help to obtain a pregnancy test based on another student's recommendation that Carroll was "really cool" and probably would not tell faculty or her parents. According to Anna, Carroll did obtain a pregnancy test for her, and after that, the pair developed a relationship. Anna described how Carroll would check up on her and would call her into his office through the school intercom, by text message, or in person whenever he saw her in the school hallways. Anna described meeting with Carroll in his office—always with the door closed, at his request—and confiding in Carroll about her "emotional life," such as boyfriend issues.

Anna testified that the relationship escalated: "[A]fter a few visits to his office, one time, after we got done talking and just, you know, hanging out, getting to talk, he got up to walk me out of the room like he would every time and he kissed me." She described the kiss as a "peck" on the lips, and that she was "just kind of in shock" afterward. According to Anna, they continued hugging and kissing at the end of their meetings for a "couple of weeks" and these meetings occurred "[m]aybe three to four times a week" and for about 10 to 15 minutes at a time. Eventually, "one time after the hugging and kissing had been going on for a while, he got up and ... was walking [her] out of the room as usual and he grabbed [her] breast" over her clothes. Anna testified that she did not report the inappropriate touching and kept returning to his office because, as she put it, "I don't know how to say no whenever it's someone in authority." According to her, the over-the-clothes groping of her breast happened "multiple times," and after "maybe a month" he started touching her breasts underneath her clothes and squeezing them for a few seconds at a time. Anna testified that "once or twice" he "put his hand down [her] pants and just in between [her] skin and [her] underwear

3

and just briefly touched [her genitalia]." She testified that her reaction was, "[l]ike all the other times, it's a shock and just 'why?' "

Anna did not tell anyone about Carroll's inappropriate advances until December 2015 when confronted with the letter found by Officer Lacroix. In an interview with Lacroix and Investigator Angela Jay, Anna admitted that she had written the letter to Carroll upon his request. As she testified at trial, when Carroll found a similar sexually explicit letter that Anna had written a male classmate—which, according to Anna, contained descriptions of sexually explicit activity that had not actually occurred—Carroll asked her, "Why don't you write me stuff like this?" Anna testified that Carroll also asked her if she would perform oral sex on him or touch him.

By the time she started her sophomore year, Anna stopped going to Carroll's office and avoided him by telling him that she "was busy and trying to focus on school."

## II.     Rule 404(b) testimony

During the trial, the State sought to present testimony by two additional female former students of Springtown, Gina and Heather, and one teacher, Terri Massey. After a hearing, the trial court ruled that the three witnesses would be permitted to testify.

### A.     Gina's testimony

Gina was Anna's classmate who also met Carroll when she was in middle school. Gina and Carroll developed a friendship, complete with their own secret handshake. When she moved on to high school, she continued talking to and confiding in Carroll during closed-door meetings in his office, which sometimes took place "multiple times a day" and lasted between five to twenty minutes. According to Gina, Carroll often complimented her, and one time when she was tired, he told her that she could take naps on the couch in his office. Gina described the offer to sleep in his office during the school day as "weird [and] uncomfortable."

Eventually, the meetings began to get in the way of her schooling. She told the jury that "[s]ometimes it would get to be too much.... When it became more frequent, then sometimes I would have to leave because I would be in the middle of a test or actually trying to learn something." And at some point, Carroll started to give her a side hug when she left his office. Gina testified that Carroll's compliments began to escalate, and she described an instance when he allegedly commented on how good she looked wearing Spandex, and she described another time when he said she could always change clothes in his office if needed. Then came the "unexpected" touching. Gina described a time when he held her hand

4

unexpectedly when showing her how to check her pulse, making her feel "awkward" and "uncomfortable."

Finally, according to Gina, the inappropriate advances culminated during her sophomore year when he "French kiss[ed]" her:

> [H]e started telling me that if he would ever have -- he would have an affair like with his wife with me (footnote omitted) and things became really personal and he -- I was becoming really uncomfortable and I asked to leave. And whenever I left, he asked me if I -- if he could give me a hug. And he did. And when I went to leave, he grabbed my neck and grabbed my face and kissed me forcefully. And then I left.

Gina testified that this incident triggered a panic attack in class afterwards that resulted in Massey's taking her to the school counselor and the school nurse. According to Gina, sometime later that day, Carroll came to find her in class and told her, "I don't want this to ruin our friendship." He asked her for another hug, Gina obliged, they hugged, she returned to class, and she never went back to Carroll's office again.

Eventually, Gina confided in Anna about the incident. At trial, Gina testified that the idea of reporting these incidents to authorities was "terrifying" until Carroll left his position as SRO.

### B. Massey's testimony

Massey testified that she had developed a close relationship with Gina when Gina was a high-school sophomore and that Gina often confided in her. She recounted one morning when Gina returned to Massey's class from the counselor's office and appeared upset and was crying and shaking in class but did not want to talk about it. When Massey offered to take Gina back to the counselor, Gina declined. Massey said that Gina was quieter after that incident, and she was not talking to her friends as much as usual. When she attempted to talk to Gina about it again, Gina again declined. According to Massey, Gina did not report the incident with Carroll to her until the next year.

### C. Heather's testimony

Heather was older than Anna and Gina. She attended Springtown High for her senior year in 2012, when she was 17 years old. Heather testified that she met Carroll about a month before her senior year began, when she filed a police report against her stepfather "for holding [her] down." So when Heather started school and saw Carroll, she recognized him and began talking to him, and then she started going to his office at least two or three times a week. She testified that she

5

revealed to him that she had been involved in a relationship with a teacher at the high school. After that revelation, the "dynamic changed" such that Heather "could tell that he was going to use that [against her]." About a week later, Carroll sent her a text message asking that she send nude pictures of herself to him. Despite her reservations, she sent him ten or so nude photos of herself, responding to his requests for "certain poses, certain body parts." According to Heather, he also requested videos, but she lied and told him that her phone could not record videos. After sending him the nude photos, she continued communicating with Carroll, but soon she dropped out of school. According to Heather, their final interaction was a 30-minute meeting at a park, where Carroll asked her to show him her breasts but she "kind of made it into a joke" and left.

### III.   Carroll's defense witnesses

#### A.   Rhonda Ribble

Rhonda Ribble was the assistant principal of the middle school when Anna got in trouble for writing sexually explicit letters to a male classmate. She described a meeting between her, Carroll, and Anna in which Carroll "chewed [Anna] out" for her behavior. Ribble testified, "It was a royal chewing out. It was actually really hurtful, I felt like, toward the girl. You know, I've listened to Officer Carroll chew out a lot of kids, and it was what they did, but it wasn't so personal as it was in this situation probably." She labeled Carroll's language as "emotionally ... belittling," "humiliating," "over the top," and "excessive." According to Ribble, Anna initially reacted by crying, but then she "just kind of stiffened up and was just looking straight ahead."

#### B.   Dr. Alexandria Doyle

Carroll called Dr. Alexandria Doyle, a licensed clinical psychologist whose practice included forensic psychology, to testify in his defense. Dr. Doyle testified that she reviewed Anna's medical records from the mental-health hospital, therapy records from a separate counseling facility, a recording of "her initial interview," CPS reports, and school records. According to Dr. Doyle, Anna had been diagnosed in the eighth grade with major depressive disorder, global anxiety or general anxiety disorder, and borderline personality tendencies. She described a person with "borderline personality tendencies" as having a more "expressively dramatic" personality "characterized by mood problems and problems seeing things clearly or seeing things the way other people do." Dr. Doyle testified that details of Anna's medical records justified that diagnosis, including that Anna had "a lot of relationship problems," "premature sexual activity," and "boundary problems," and that she got "too involved and then ha[d] fights with [people]."

Dr. Doyle characterized Anna's sexually explicit letters as consistent with her diagnosis of borderline personality disorder, because such a diagnosis "often

involves problems with . . . sexually excessive behavior." Regarding Anna's sexually explicit letter to Carroll, Dr. Doyle opined that Anna was acting out her impulses to be in a relationship with Carroll through a "seductive, kind of in-your-face letter to him, really a provocative letter." She testified that the letter was a "fantasy."

Dr. Doyle also hypothesized that Anna might not have remembered the very tense meeting described by Ribble because Anna might have "blocked it out because it was so unpleasant, it was so painful." She also testified that, in addition to memory suppression, a person with borderline personality traits may also experience "memory confabulation," in which memories of experiences become altered—"So if ... somebody says something to you that sounds like a good aspect of it, you may incorporate that into your story because you're so impressionable and it's suggestive."

### C. Carroll

Carroll elected to testify in his own defense. Carroll explained that he often met with students in his office as part of his role as SRO. Carroll recalled meeting Anna when she was in middle school and he was called in to meet with Anna and Ribble about the sexually explicit letters Anna had written to a classmate. Carroll testified that he was "firm" when he began talking to Anna, but when he perceived that Anna was not responding he became "more direct and more verbal." He agreed with Ribble's description and that his demeanor and language could have been perceived as humiliating and embarrassing for Anna.

Carroll admitted that Anna came to his office frequently and that they discussed some of Anna's personal issues, including her parents' divorce and "extremely a lot about her boyfriend." He alleged that Anna generally initiated their contact, testifying that "[T]here [were] times where she would request for me to call for her, for which might be once every three to four weeks, to where she would want to come into the office a couple of times a week." Carroll adamantly denied ever buying Anna a pregnancy test, asking her to write the sexually explicit letter addressed to him, or having any inappropriate contact with or kissing her. According to Carroll, he found the sexually explicit letter sitting on his desk one day, but he never confronted Anna about it because he thought such a confrontation might "set her back" when she had progressed so far since the eighth-grade incident. Carroll told the jury that, sometime after that, another student informed him that Anna "had the hots for [him]" and "wanted to be with [him]," so he "kept his distance from [Anna]." He did not report the letter or Anna's alleged crush to anyone.

Similarly, when asked about Gina, Carroll denied any inappropriate contact, and he denied ever propositioning her for a sexual affair.

> As for Heather, Carroll explained that he met her when he was on patrol and had been dispatched to a local park in response to a report of a woman sleeping in a truck. Carroll testified that Heather appeared to be living in her truck at the time, so he provided her with a contact for a local women's shelter and assisted her in making a police report about her father. Later, Carroll heard rumors that Heather was involved in a relationship with another school employee, and he informed the principal of those rumors. He testified that he also told Heather that he had heard the rumor but that Heather denied any such relationship. And when he confronted her about the rumor a second time in the presence of the principal, she again denied it. He testified that, apart from seeing her in the hallway from time to time, the meeting with the principal was the last time he ever spoke to Heather. Carroll denied ever attempting to blackmail Heather by asking her for nude pictures of herself or having any inappropriate contact with her.

*Id.*, 2020 WL 938189, at *1–4.

## II. ISSUES

The Court understands Carroll to allege the following three grounds for relief:

1. Trial counsel provided ineffective assistance by failing to object to improper jury argument; (Carroll's Grounds 1 and 2);

2. Appellate counsel provided ineffective assistance by failing to challenge the sufficiency of the evidence on direct appeal; (Carroll's Grounds 3 and 4), and

3. Trial counsel provided ineffective assistance by failing to move for a directed verdict based on insufficient evidence (Carroll's Grounds 5 and 6).

Pet. 6-8, ECF No. 1; Brief 6–8; ECF No. 2.

## III. RULE 5 STATEMENT

Respondent believes that Carroll sufficiently exhausted his state remedies as required by 28 U.S.C. § 2254(b)(1) with regard to the allegations in this case. 28 U.S.C. § 2254(b). Respondent also believes that Carroll's claims are not barred by the statute of limitations or subject to the successive petition bar. *See* 28 U.S.C. §§ 2244(b) and 2244(d). Resp. 10, ECF No. 14.

## IV.     ANALYSIS

### A.     AEDPA Standard of Review

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the AEDPA, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. *Id.* at § 2254(d)(1)–(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

When the TCCA, the state's highest criminal court, refuses discretionary review or denies state habeas-corpus relief without written order, opinion, or explanation, typically it is an adjudication on the merits, which is likewise entitled to this presumption. *Harrinton,* 562 U.S. at 100; *Singleton v. Johnson,* 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres,* 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). In such a situation, a federal court "should 'look through' the unexplained decision to the last related state-court decision" providing particular reasons, both

legal and factual, and "presume that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision. *Wilson v. Sellers,* — U.S. —, 138 S. Ct. 1188, 1192 (2018).

**B.     Ineffective Assistance of Trial Counsel (Grounds 1 and 3).**

Carroll alleges that his trial counsel, Kirk Claunch and Kyle Claunch, were ineffective because they did not object to alleged improper jury argument and did not move for a directed verdict based on insufficient evidence. ECF No. 1, at 6–8; ECF No. 2, at 3–7. For the reasons explained below, the Court finds these claims are conclusory, refuted by the record, and without merit.

        1.    <u>Standard of Review: *Strickland v. Washington*, "Doubly Deferential" Review.</u>

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey,* 469 U.S. 387, 393–95 (1985); *Strickland v. Washington,* 466 U.S. 668, 688 (1984). An ineffective-assistance claim is governed by the familiar standard set forth in *Strickland v. Washington,* under which a petitioner must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697. In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id.* at 688–89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the "distorting effects of

10

hindsight." *Id.* at 689.

Where a petitioner's ineffective-assistance-of-counsel claims have been reviewed on their merits under *Strickland* and denied by the state courts, federal habeas relief will be granted only if the state courts' determination involved an <u>unreasonable</u> application of *Strickland* in light of the state-court record, a substantially higher threshold. *Harrington*, 562 U.S. at 100–01 (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)); *Bell v. Cone*, 535 U.S. 685, 698–99 (2002). As the Supreme Court has explained, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Thus, a federal court's review of state-court decisions regarding ineffective assistance of counsel must be "doubly deferential" so as to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)).

    2.  <u>Failing to Object to Jury Argument (Ground 1).</u>

Carroll claims that trial counsel was ineffective by failing to object to improper jury argument. Pet. 6, ECF No. 1; Brief 4-6, No. 2. Carroll points to the following part of the State's closing argument as objectionable:

> Ladies and gentlemen, I hope you don't believe the story that was told, because that's exactly what it was. It was a story. You heard Alexis. She testified to everything that happened. You heard about -- she's testifying, no, he didn't penetrate me. That didn't happen. She's not here to do anything but tell you the truth. And I hope you listen to her and I hope you believed her because she told you the truth.

Pet. 6, ECF No. 1 (citing argument found at 4 RR 201, ECF No. 16-4).

Trial counsel has broad discretion when it comes to determining the best strategy. *See*

11

*Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir. 2015) (the Supreme Court has emphasized that counsel has "wide latitude in deciding how best to represent a client") (*abrogated on other grounds*, *Ayestas v. Davis*, 138 S. Ct. 1080 (2018)); *Clark v. Thaler*, 673 F.3d 410, 427 (5th Cir. 2012) (recognizing the broad deference to which counsel is entitled in making tactical decisions in closing argument "because of the broad range of legitimate defense strategy at that stage") (citation omitted). Decisions to object or not object during closing argument are matters of trial strategy that are presumed reasonable under *Strickland*. *Wiley v. Puckett*, 969 F.2d 86, 102 (5th Cir. 1992). Furthermore, under Texas law, while a prosecutor generally cannot vouch for the credibility of its own witnesses by giving unsworn testimony, a prosecuting attorney may make arguments as to the truthfulness of a witness's testimony that are based on the evidence presented and reasonable deductions from that evidence. *Hinojosa v. State*, 433 S.W.3d 742, 763 (Tex. App. 2014).

At trial, the complainant testified that Carroll touched her breasts but denied that he had penetrated her—testimony which caused the State to abandon Count I, sexual assault of a child. *See* 3 RR 74–77, 95, 139, ECF No. 16-3; 4 RR 20–21, ECF No. 16-4. The prosecutor could reasonably have inferred from the evidence that the complainant did not fabricate the allegation that Carroll had touched her breasts, and trial counsel was not ineffective for not making an objection that would have been denied. *See Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite"); *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) (citing *Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("failure to make a frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness . . . .").

After reviewing Carroll's claims, Judge Graham Quisenberry, 415th District Court, Parker County, Texas, found that "there are no disputed issues of fact with regard to [Carroll's state writ application]" and recommended that relief be denied. SHR, at 77, ECF No. 16-14. The TCCA implicitly adopted this finding when it denied Carroll's state habeas application. SHR at "Action Taken," ECF No. 16-8. When a petitioner's ineffective assistance claims have been reviewed on their merits and denied by the state court, federal habeas relief will be granted only if the state courts' decision was contrary to or involved an unreasonable application of the standard set forth in clearly established Supreme Court precedent, here the *Strickland* standard. *See Haynes v. Cain*, 298 F.3d 375, 379 (5th Cir. 2002); *Santellan v. Cockrell*, 271 F.3d 190, 198 (5th Cir. 2001). The Court concludes that Carroll failed to meet this burden, and, for this reason, this claim must be denied. In addition, Carroll fails to show that his case was prejudiced by this alleged trial-counsel deficiency. *See Strickland*, 466 U.S. at 687.

### 3. Failing to Move for a Directed Verdict Based on Insufficient Evidence (Gound 3).

Carroll claims that his trial counsel provided ineffective assistance by failing to move for a directed verdict based on insufficient evidence. Pet. 6, 8, ECF No. 1; Brief 7-13, ECF No. 2, But the record shows that trial counsel <u>did</u> move for a directed verdict based on the insufficiency of the evidence at the close of the State's case-in-chief:

> (Counsel) Mr. Kirk Claunch: In light of that, Your Honor, at this point the Defendant would make its motion for a directed verdict of not guilty as to the count on indecency of a child based upon the insufficiency of the evidence.
>
> The COURT: Asking on what now?
>
> Mr. Kirk Claunch: On the remaining count.

>The COURT: All right.
>
>Mr. Kirk Claunch: The defendant moves for a directed verdict based upon the insufficiency of the evidence.
>
>The COURT: Motion denied.

4 RR 21, ECF No. 16-4. Because the record directly refutes the factual basis of this ineffective assistance claim, Carroll cannot show any deficient conduct. Moreover, Carroll has not shown the state court's rejection of this claim was unreasonable. As such, this ground for relief must be denied.

### C. Ineffective Assistance on Appeal (Ground 2)

Carroll also claims that he was denied effective assistance of appellate counsel because Kirk Claunch and Kyle Claunch (acting as appellate counsel), failed to raise a claim of insufficient evidence on direct appeal. ECF No. 1, at 8; ECF No. 2, at 7–13. For the reasons explained below, this ground must also be denied.

#### 1. *Strickland v. Washington* Standard Apples to Claims of Ineffective Assistance on Appeal.

With an ineffective-assistance-of-counsel-on-appeal claim, a petitioner must also satisfy the two-pronged test enunciated in *Strickland*. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (proper standard for evaluating appellate counsel is *Strickland v. Washington*). Thus, a petitioner must demonstrate counsel was deficient and that the deficiency prejudiced his case. *Strickland*, 466 U.S. at 687. Counsel's assistance becomes ineffective when counsel's errors are prejudicial, in that there is a reasonable probability that but for the error the ultimate result would have been different. To prove prejudice, a petitioner must show that but for counsel's deficient performance "he would have prevailed on appeal." *Smith*, 528 U.S. at 285-86.

To demonstrate deficiency on an allegation of failure to advance certain issues on appeal, a petitioner must show that "counsel unreasonably failed to discover [and raise] nonfrivolous issues." *Id*. Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select among them in order to maximize the likelihood of success on appeal." *Id.* at 288 (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). Thus, it is possible that an ineffectiveness claim may be "based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent." *Id*. (citation omitted). Indeed, in considering the deficient performance prong, an attorney's decision not to pursue a certain claim on appeal after considering the claim and believing it to be without merit falls within the "wide range of professionally competent assistance" demanded by *Strickland*. *Smith v. Murray*, 477 U.S. 527, 536 (1986).

        2.       <u>Claim of Ineffective Assistance on Appeal Must be Denied (Ground 2)</u>.

Carroll's claim of ineffective assistance on appeal fails because he does not satisfy either prong of *Strickland*. The Supreme Court has held that counsel "need not advance every argument, regardless of merit, urged by the appellant." *Evitts v. Lucey*, 469 U.S. 387, 394 (1985) (citing *Jones*, 463 U.S. at 751-52). The process of winnowing out weaker arguments and focusing on those that appear more likely to prevail is the hallmark of effective appellate advocacy. *Id*. Carroll bases his claim that there should have been an appellate challenge to the sufficiency of the evidence on alleged inconsistencies in the victim's testimony and a "lack of corroborating testimony or evidence." Brief at 9, ECF No. 2. The resolution of credibility issues and the weight to attach to particular evidence, however, are matters left to the jury and do not cause the evidence to be legally insufficient. *See United States v. Nguyen*, 28 F.3d 477, 480 (5th

15

Cir. 1994) ("[a]ll credibility determinations and reasonable inferences are to be resolved in favor of the jury's verdict.") (citation omitted); *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985) ("we should not substitute our view of the evidence for that of the fact-finder, but consider all of the evidence in the light most favorable to the prosecution") (citation omitted); *Cobb v. Wainwright*, 666 F.2d 966, 971 (5th Cir. 1982) ("the jury has the sole responsibility to judge the weight and credibility of the evidence"). Moreover, under Texas law, a child victim's uncorroborated testimony is sufficient to support a conviction for indecency with a child. *See* Tex. Code Crim. Proc. art. 38.07. Because the evidence was legally sufficient to support Carroll's conviction, appellate counsel was not ineffective for failing to raise this issue on direct appeal.

Carroll fails to rebut the presumption that appellate counsel briefed his appeal based on sound strategy and cannot prove either deficiency or prejudice in appellate counsel's representation. He therefore cannot establish that the state court's rejection of his claim was unreasonable, and his ineffective assistance of appellate counsel claim must be denied.

### D.    Carroll has Failed to Meet His Burden of Proof.

Finally, the Court notes again that Carroll has failed to meet the requisite burden of proof required to be granted relief on his ineffective assistance claims under AEDPA. Carroll raised these same claims in his application for state writ of habeas corpus. *See* SHR, at 18–23, ECF No. 16-14. In response, the state prosecutor provided a reply, addressing why Carroll's claims were not supported. SHR, at 46-52, ECF No. 16-14.  In turn, as noted above, the presiding judge entered an order that the state writ application should be denied, and the TCCA then denied Carroll relief on these allegations on the merits. SHR, at 77 (trial court's order), ECF No. 16-14;

SHR at "Action Taken," ECF No. 16-8; *see also Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) (holding a "denial" signifies an adjudication on the merits while a "dismissal" means the claim was declined on grounds other than its merits). The TCCA made credibility choices in favor of the State, and the implicit findings that flow from the court's credibility choices are presumed correct in federal court. That the TCCA did not make explicit fact findings on the issues does not mean the court "merely arrived at a legal conclusion" unworthy of the presumption of correctness. Both implied and explicit fact findings fall within the ambit of § 2254(d). *Cantu v. Collins*, 967 F.2d 1006, 1015 (5th Cir. 1992) (citing *Marshall v. Lonberger*, 459 U.S. 422, 433–34 (1983) (other citations omitted)).

      Carroll has not shown the state court's determinations resulted in a decision "that was contrary to, or [that] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1). The state court's denial of relief on Carroll's claims of ineffective assistance of counsel was reasonable, and Carroll has not overcome the "doubly" deferential assumption in favor or the state court denial. *Tidlow*, 571 U.S. at 15. Therefore, Carroll has not shown that he is entitled to relief under § 2254, and this petition must be denied.

## V. CONCLUSION

For all of the reasons discussed herein, Franklin Thomas Carroll's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED**. Further, for the reasons discussed, a certificate of appealability is **DENIED**.

**SO ORDERED** on this **27th day** of **June, 2022.**

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

18